IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

WILLIAM WHITTAKER,
       Plaintiff,

v.                              Civil Action No. 3:21cv474

JIM O'SULLIVAN, et al.,
       Defendants.

## OPINION

William Whittaker sues Sheriff Jim O'Sullivan, Sergeant Christopher Earles, Senior Deputy Jamie Fanelli, Sergeant Duane Gill, Deputy Levi Golt, Captain Timothy Morgan, Dr. Alex Taylor, Director of Nursing Brittany Jones, Nurse Pam Smith, Nurse Jaqueline Winstead, and Correct Care Solutions, LLC, now conducting business as Wellpath, LLC ("CCS") for events related to Whittaker's medical care while he was incarcerated at the Chesapeake Correctional Center.[1]  Whittaker alleges that he missed seven to ten doses of his medication and received no bloodwork to monitor his condition through the course of his eleven months at Chesapeake Correctional Center.  He further alleges that defendants Golt and Winstead improperly disclosed his medical status which caused another inmate to attack him.

Whittaker raises negligence (Count One), gross negligence (Count Two), and willful and wanton negligence (Count Three) state law claims against all the defendants.  He raises a constitutional claim for failure to provide adequate medical care (Count Four) against Winstead, Jones, Taylor, Smith, Earles, Fanelli, Gill, Golt, and Morgan.  He raises a constitutional claim for violation of his privacy rights (Count Five) against Winstead and Golt.  He raises a state law claim of

---

[1] The Court refers to O'Sullivan, Earles, Fanelli, Gill, Golt, and Morgan collectively as the "jail defendants."  The Court refers to Taylor, Jones, Winstead, and Smith collectively as the "medical defendants."

improper disclosure of medical information (Count Six) against Winstead, Golt, CCS, and O'Sullivan. He raises a supervisory liability constitutional claim related to his medical care and privacy (Count Seven) against Jones, Smith, Taylor, and O'Sullivan. He also raises a supervisory liability constitutional claim related to just his privacy (Count Eight) against O'Sullivan, Earles, Gill, Morgan, and Fanelli. Finally, he raises a constitutional municipal liability claim (Count Nine) against O'Sullivan and Taylor in their official capacities and CCS. Each of the defendants moves to dismiss the respective claims they face.

Upon review of Whittaker's complaint, the Court finds that he fails to state a simple negligence claim against any defendant because sovereign immunity protects the jail defendants and, as for the medical defendants, Whittaker did not comply with a state law requiring that he obtain a certifying expert medical opinion at the time of service of process. This lack of an expert witness opinion dooms Whittaker's other negligence claims against the medical defendants. Whittaker fails to state a gross or willful and wanton negligence claim against Earles, Gill, and Morgan because they each exercised some degree of care in responding to Whittaker's needs. He also fails to state such claims against Fanelli because he does not allege that Fanelli knew of the deficiencies in his medical care. Whittaker does, however, state claims for gross and willful and wanton negligence against Golt, who disclosed Whittaker's medical condition and, in so doing, caused him harm.

As for the failure to provide adequate medical care, Whittaker states a claim against Jones and Winstead but not Taylor, Smith, or any of the jail defendants. Whittaker does not allege facts that suggest Taylor, Smith, or any of the jail defendants knew of health risks he faced while at the jail.

2

Whittaker does not state a claim for violation of his privacy rights under either the Constitution or state law. First, he has no constitutional privacy rights in prison with respect to his medical condition. Likewise, Virginia does not recognize a right of action for improper disclosure of medical information against non-medical professionals, and he fails to allege facts to support his claim against the medical professionals.

Whittaker does not state a constitutional claim for supervisory liability against any jail defendant because he does not establish an underlying violation of a corresponding constitutional right. Likewise, he fails to state a claim for supervisory liability against any medical defendant. While he does state an underlying constitutional claim against Jones and Winstead, he does not demonstrate that those violations arose from a supervisory relationship with another medical defendant.

Whittaker states a constitutional municipal liability claim against O'Sullivan and Taylor in their official capacities and CCS because he alleges facts that suggest they had knowledge of a potentially widespread unconstitutional practice among jail medical personnel.

## I. <u>FACTS ALLEGED IN THE COMPLAINT</u>

On July 31, 2020, Whittaker was arrested and detained at the Chesapeake Correctional Center. (ECF No. 16 ¶ 19.) Following his detention, the jail did not have his particular medication for the first few days, but family members were able to drop it off. (*Id.* ¶ 20–22.) The jail's medical personnel work for CCS, a private corporation, under the supervision of Dr. Alex Taylor, the Medical Director of the Chesapeake Correctional Center. (*Id.* ¶¶ 12–13.)

On May 4, 2021, Whittaker again did not receive his medication. (ECF No. 16 ¶ 24.) He explained to the nurse on duty, Jacqueline Winstead, "the severity of his health condition and that it was imperative for him to take his medication." (*Id.* ¶ 25.) He also explained that missing

3

medication "could cause his body to build a resistance and possibly contract an opportunistic in-
fection." (*Id.* ¶ 26.)  Winstead replied, "That is not my problem." (*Id.* ¶ 27.)  Whittaker then
asked if she would tell Brittany Jones, the Director of Nursing, that he needed bloodwork to
monitor his disease. (*Id.* ¶¶ 28, 30.)  He explained that had received no bloodwork since his de-
tention and that prior to his detention he would receive bloodwork every ninety days. (*Id.* ¶ 29.)
Winstead told Whittaker, "It is not my responsibility to report that." (*Id.* ¶ 31.)

Also on May 4, 2021, Whittaker asked Deputy Golt about seeing medical staff and re-
ceiving his medication. (*Id.* ¶ 33.)  Golt then "made an intentional decision to publicly disclose,
in a joking manner, . . . [Whittaker's medical condition] and [that he] needed his medication."
(*Id.* ¶ 34.)  The disclosure occurred within earshot of thirteen inmates, including Morrison, who
began laughing along with Golt. (*Id.* ¶¶ 35, 38.)

On May 6, 2021, Whittaker filed a grievance pertaining to the delay in medication.  The
grievance stated:

> I didn't receive my medication during med pass; my health depends on it. I must
> take it daily as prescribed by my doctor. My private medical information [is] be-
> ing discussed with the staff members that aren't medical. A statement was made
> about my medication, the staff member knew the type of med.

(*Id.* ¶¶ 43–44 (alteration in original).)  Sergeant Gill received the grievance and met with Whit-
taker in person. (*Id.* ¶¶ 45–47.)  Whittaker cried and begged Gill to get his medication because
without it he "was more at risk of [COVID-19] or death." (*Id.* at ¶ 46.)  Gill told Whittaker that
he had relayed his concerns to Jones "and that she would come to speak to" Whittaker. (*Id.* ¶
47.)  Jones never spoke with him. (*Id.* ¶ 48.)  Whittaker appealed his grievance resolution that
same day.  On June 7, 2021, June 10, 2021, July 5, 2021, July 6, 2021, July 7, 2021, July 9,
2021, and July 13, 2021, Whittaker sent correspondence forms to "multiple prison staff" voicing
his concerns. (*Id.* ¶ 50.)

4

On July 2, 2021, Morrison punched Whittaker in the face because Whittaker "did [Morrison's] hair and could have given him" his disease. (*Id.* ¶ 52.) The night of the assault, Deputy Antinet had left Morrison's and Whittaker's cell blocks unlocked. (*Id.* ¶¶ 54, 55.)[2] As a result of the assault, Whittaker suffered "a busted lip, blackened eyes, [a] potential fracture to his nose," and "light headedness from the inability to breathe through his nose, blurred vision, extreme pain from nasal septum deviation, headaches, dizziness, and vomiting." (*Id.* ¶ 57.) Whittaker received pain medication, but he did not initially receive an X-ray, and he never received his X-ray results despite his many requests. (*Id.* ¶¶ 58–62.)

On July 14, 2021, Senior Deputy Fanelli responded to Whittaker (presumably to one of his correspondence forms) and explained that Whittaker "should have never received a grievance" for his medical privacy concerns. (*Id.* ¶ 66.) On July 18 and 23, 2021, Whittaker sent out more correspondence forms to "prison staff." (*Id.* ¶ 67.) On July 30, 2021, Captain Morgan "advised [Whittaker] that there is not a deputy that deals with HIPPA[3] violations." (*Id.* ¶ 68.) On July 31, 2021, Whittaker filed a second grievance form outlining the same complaint from the first grievance. (*Id.* ¶ 69.) Sergeant Earles received the second grievance and completed a "supervisor statement" noting that Whittaker had spoken with Morgan. (*Id.* ¶ 70.) On August 7, 2021, Whittaker wrote to Sheriff O'Sullivan "to indicate his dissatisfaction with the meeting with . . . Morgan and Pam Smith and requested his grievance be taken seriously." (*Id.* ¶ 72.)

Ultimately, Whittaker missed "at a minimum" seven to ten daily doses of medication during his eleven months at the Chesapeake Correctional Center. (*Id.* ¶ 23.) He contracted COVID-

---

[2] Though named as a defendant, Antinet has not yet been served.

[3] Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996).

19 after being transferred to a new jail, and he suffered symptoms including a headache, fever of 103 degrees, diarrhea, vomiting, fatigue, loss of appetite, shortness of breath, excessive sleeping, and bone pain. (*Id.* ¶ 76.)

## II. <u>ANALYSIS</u>[4]

### *A. Negligence (Count One)*

Whittaker brings his negligence claim against both the jail and the medical defendants. (ECF No. 16 ¶ 90.)  The jail defendants move to dismiss his claim under the doctrine of sovereign immunity, and the medical defendants move to dismiss his claim for failure to comply with the requirements of the Virginia Medical Malpractice Act ("VMMA").

#### *1. Jail Defendants*

In Virginia, sovereign immunity bars simple negligence claims against government officials.[5]  In *James v. Jane*, the Supreme Court of Virginia explained two theories by which an official can enjoy the immunity of the state.  *Id.*  First, if the Virginia Constitution explicitly grants discretionary power to a state official, he enjoys the immunity of the state for claims that arise from the exercise of that discretionary power.  *Id.*  For other state officials, courts examine:

---

[4] In considering Rule 12(b)(6) motions, a court must accept all allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009) (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)).  Pleadings consisting of "no more than conclusions," however, "are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  To survive a Rule 12(b)(6) motion to dismiss, a complaint must state facts that, when accepted as true, state a claim to relief that is plausible on its face. *Id.*  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

[5] Sovereign immunity is not available for gross negligence or willful and wanton negligence. *James v. Jane*, 221 Va. 43, 53, 282 S.E.2d 864, 869 (1980).

    1. the nature of the function performed by the employee;
    2. the extent of the state's interest and involvement in the function;
    3. the degree of control and direction exercised by the state over the employee; and
    4. whether the act complained of involved the use of judgment and discretion.

*Messina v. Burden,* 228 Va. 301, 313, 321 S.E.2d 657, 663 (1984) (citing *James,* 221 Va. at 53, 282 S.E.2d at 869). Municipal employees may claim the protection of sovereign immunity if they satisfy the *James* test. *Id.* at 312–13, 321 S.E.2d at 663–64 (explaining that when a government entity enjoys the immunity of the state, courts should treat employees of that entity like state employees "in a proper case"). Municipalities are entitled to the same immunity as the state when they face claims arising out of governmental functions. *Massenburg v. City of Petersburg*, 298 Va. 212, 217–218, 836 S.E.2d 391, 395–96 (2019).

    Because the Virginia Constitution and state law grant "broad discretionary power" to sheriffs in operating their jails, sheriffs are entitled to the immunity of the state. *Verry v. Barry*, No. 2005-7454, 71 Va. Cir. 318, 2006 WL 2578368, *1–2 (Va. Cir. Ct. July 27, 2006); *see also Doud v. Commonwealth*, 282 Va. 317, 320–21, 717 S.E.2d 124, 125–26 (2011) (explaining that the Virginia Tort Claims Act does not waive a sheriff's sovereign immunity). Here, the only factual allegations that implicate O'Sullivan are his receipt of a letter from Whittaker expressing dissatisfaction concerning a meeting Whittaker had with other defendants, (ECF No. 16 ¶ 72), and O'Sullivan's role as an ultimate "decision maker" within the jail, (*id.* ¶ 82). Because Whittaker's claims against O'Sullivan arise directly from his discretionary power in operating the Chesapeake Correctional Center, sovereign immunity applies with respect to Whittaker's simple negligence claim against him. *See Lloyd v. Morgan*, No. 4:14cv107, 2015 WL 1288346, at *11 (E.D. Va. Mar. 20, 2015) (recognizing sovereign immunity for sheriffs who face negligence claims related to their role "in overseeing the custody of inmates"). Thus, the Court will dismiss Count One against O'Sullivan.

The claims against the other jail defendants also arose from their conduct in operating a jail and, thus, arose out of their performance of government functions.[6]  In addition, the jail defendants exercised considerable discretion in how they responded to Whittaker's complaints. Thus, "[e]ven if . . . the defendant deputies were somehow negligent in the manner in which they handled [Whittaker's complaints]," sovereign immunity protects them because they "were engaged in an essential governmental function involving the exercise of discretion and judgment at all times relevant to the complaint." *Est. of Harvey ex rel. Dent v. Roanoke City Sheriff's Off.*, 585 F. Supp. 2d 844, 864 (W.D. Va. 2008).  Thus, the Court will also dismiss Count One against Earles, Gill, Fanelli, Morgan, and Golt.

### 2. *Medical Defendants*

Virginia law does not distinguish between malpractice and ordinary negligence arising from medical care—a plaintiff must pursue a tort arising from medical care as a malpractice claim.  *See Gonzalez v. Fairfax Hosp. System, Inc.*, 239 Va. 307, 309–11, 389 S.E.2d 458, 459–60 (1990); *Hagan v. Antonio*, 240 Va. 347, 351–52, 397 S.E.2d 810, 811–12 (1990).  Virginia law defines medical malpractice as "any tort action or breach of contract action for personal injuries or wrongful death, based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient."  Va. Code Ann. § 8.01-581.1.  Malpractice claims must comply with the Virginia Medical Malpractice Act ("VMMA"), which requires a plaintiff to obtain a certifying expert witness opinion at the time of service of process. Va. Code Ann. § 8.01-20.1.  The statute permits an exception to this requirement when "the al-

---

[6] *See Dowdy v. Pamunkey Reg'l Jail Auth.*, No. 3:14cv003, 2014 WL 2002227, at *3 (E.D. Va. May 15, 2014) ("The Virginia Supreme Court has clearly held that the operation of a jail is a governmental function, for which a municipal corporation is immune from suit." (citing *Franklin v. Town of Richlands*, 161 Va. 156, 158, 170 S.E. 718, 719 (1933))).

leged act of negligence clearly lies within the range of the jury's common knowledge and experience." *Id.* The exception is limited to "rare instances" when an expert is not necessary to establish the standard of care, whether the defendant breached the standard of care, and whether the breach caused the alleged harm. *Beverly Enterprises-Va., Inc. v. Nichols*, 247 Va. 264, 267, 441 S.E.2d 1, 3 (1994).[7]

Whittaker alleges that the medical defendants negligently failed to provide his medication seven to ten times over the course of eleven months and failed to carry out bloodwork to monitor his condition. (ECF No. 16 ¶¶ 23, 29–31, 87.) While Whittaker does not explicitly lay out a malpractice claim, his complaint arises from his medical care. *See* Va. Code Ann. § 8.01-581.1 ("'Health care' means any act . . . or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical diagnosis, care, treatment or confinement."). Thus, the VMMA applies, and Whittaker had to certify that he had an expert medical witness opinion at the time of service of process unless he fell within the narrow exception. *See id.* § 8.01-20.1.

Whittaker did not certify that he had a witness, and the facts as alleged do not indicate that his claim falls within a "jury's common knowledge and experience." *See id.* A jury would likely understand the gravity of missing doses of vital medication, but that does not mean a jury would understand the standard of care absent an expert witness opinion.

---

[7] *See, e.g., Coston v. Bio-Med. Applications of Va., Inc.*, 275 Va. 1, 7, 654 S.E.2d 560, 563 (2008) (expert testimony was not necessary to determine whether dialysis center was negligent in putting patient in faulty chair that led to injury); *Dickerson v. Fatehi*, 253 Va. 324, 327–28, 484 S.E.2d 880, 882 (1997) (expert testimony was not necessary to determine whether surgeon was negligent in leaving hypodermic needle inside patient); *Beverly Enterprises-Va., Inc.*, 247 Va. at 267, 441 S.E.2d at 3 (expert testimony was not necessary to determine whether nursing home staff was negligent in not supervising resident with eating difficulties who choked to death while eating alone).

When a plaintiff fails to comply with the expert witness opinion requirement, "the court shall impose sanctions according to the provisions of § 8.01-271.1 and may dismiss the case with prejudice." Va. Code Ann. § 8.01-20.1. Consistent with the statutory language, failure to comply with the expert witness opinion requirement constitutes grounds for dismissal. *See, e.g.,* *Parker v. United States*, 475 F. Supp. 2d 594, 596 (E.D. Va. 2007). Thus, the Court will dismiss Count One against the medical defendants.

### 3. *CCS*

Because *respondeat superior* is merely a theory of liability under which an employer must answer for the tortious conduct of his employee, *Plummer v. Ctr. Psychiatrists, Ltd.*, 252 Va. 233, 235, 476 S.E.2d 172, 173 (1996), Whittaker's failure to state a claim for negligence against the medical defendants is fatal to his negligence claim against CCS under a *respondeat superior* theory. Thus, the Court will also dismiss Count One against CCS.

### B. Gross Negligence (Count Two)

Whittaker also raises a gross negligence claim against all the defendants. (ECF No. 16 ¶ 104.) In Virginia, courts define gross negligence as negligence of a degree that "shows such indifference to others as constitutes an utter disregard of prudence amounting to a complete neglect of the safety of [another]."[8] *Id.* A claim of gross negligence, however, "must fail as a matter of law when the evidence shows that [a] defendant[] exercised some degree of care." *Elliott v. Carter*, 292 Va. 618, 622–23, 791 S.E.2d 730, 732–33 (2016).

---

[8] Gross negligence also requires the elements of simple negligence: duty, breach, causation, and harm. *Ferguson v. Ferguson*, 212 Va. 86, 92–93, 181 S.E.2d 648, 653 (1971).

*1. Gill, Morgan, & Earles*

Gill, Morgan, and Earles each exercised care in their response to Whittaker's medical needs. Gill spoke to medical staff regarding delays in Whittaker's medication. (ECF No. 16 ¶ 47.) Morgan met with Whittaker to discuss his grievances. (*Id.* ¶¶ 68, 70.) Earles received Whittaker's second grievance form and wrote a supervisor statement regarding the form. (*Id.* ¶ 70.) Each of the defendants thus exercised a degree of care in responding to Whittaker's grievances. While the care may not have been optimal, "the standard for gross negligence [in Virginia] is one of indifference, not inadequacy." *Elliott*, 292 Va. at 622, 791 S.E.2d at 732 (alteration in original) (quoting *Kuykendall v. Young Life*, 261 Fed. Appx. 480, 491 (4th Cir. 2008)). Thus, Whittaker fails to state a claim for gross negligence against Gill, Morgan, and Earles, and the Court will dismiss Count Two against those defendants.

*2. Fanelli*

Though Fanelli did not exercise a degree of care like the other jail defendants, Whittaker fails to state a claim against him because he alleges insufficient facts to raise his claim to the level of plausibility. Under the federal pleading standard, the possibility of misconduct is not enough—the facts must allow for a reasonable inference of plausibility. *Iqbal*, 556 U.S. at 679. The alleged facts do not indicate that Fanelli breached any potential duty of care or even knew of Whittaker's concerns related to medical care. The complaint suggests that Whittaker only communicated with Fanelli about his privacy concerns. (*See* ECF No. 16 ¶¶ 60, 66.) To conclude a breach of duty under such sparse allegations requires too great of an inferential step.[9] Thus,

---

[9] Whittaker says that the Court should grant the motions to dismiss only "if it appears beyond a doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief." (ECF No. 58, at 2–3 (citing *Conley v. Gibson*, 355 U.S. 41, 48 (1957).) This is

Whittaker fails to state a claim for gross negligence against Fanelli, and the Court will grant the motion to dismiss Count Two against him.

### 3. *Golt*

Unlike the other jail defendants, Golt cannot refute the gross negligence claim under the *Elliott* standard because the facts as alleged do not indicate that he took any measure to respond to Whittaker's needs. *See* 292 Va. 618, 791 S.E.2d 730. In fact, when Whittaker asked Golt to retrieve medical staff, Golt disclosed Whittaker's health condition in a joking manner within earshot of several inmates. (ECF No. 16 ¶¶ 33–35.)

Even overcoming that initial hurdle, Whittaker must plausibly demonstrate the underlying elements of negligence and the additional element of indifference. *Ferguson*, 212 Va. at 92–93, 181 S.E.2d at 653. To state a negligence claim, a plaintiff must allege "the existence of a legal duty, a breach of the duty, and proximate causation resulting in damage." *Atrium Unit Owners Ass'n v. King*, 266 Va. 288, 293, 585 S.E.2d 545, 548 (2003). The detrimental effects of Golt's improper disclosure, including an assault by another inmate, arguably satisfy the requirement of an injury.

Whittaker argues that Golt had a duty to protect him from other inmates. (ECF No. 58, at 14.) While Virginia lacks extensive case law on the duty that jail personnel owe to inmates, the Supreme Court of Virginia recognizes a general duty of care to "avoid injuring others." *RGR, LLC v. Settle*, 288 Va. 260, 275–76, 764 S.E.2d 8, 16–17 (2014). And that duty apparently extends to jails. *See AlBritton v. Commonwealth*, 299 Va. 392, 406, 853 S.E.2d 512, 520 n.7 (2021) (explaining with respect to premise liability that "[t]here is little contest that a general du-

---

incorrect. As the Supreme Court has explained, the "['no set of facts'] phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard." *Twombly*, 550 U.S. at 563.

ty of care exists, but the nature of that duty and the manner of its breach could in some cases be different in a prison context than in a typical restaurant, business, or private home"); *cf. also Williams v. Commonwealth*, 294 Va. 25, 29 n.3, 810 S.E.2d 885, 889 n.3 (2017) ("The [Department of Corrections] is also responsible for [the inmate's] safety and the safety of others with whom he comes into contact during his period of incarceration.").

As to whether Golt breached his duty of care in disclosing Whittaker's medical condition, the joking manner of the disclosure suggests that the disclosure did not serve legitimate ends. Further, Golt said, "[E]veryone should know about you."  (ECF No. 16 ¶¶ 35, 40.)  This indicates that Golt knew of the stigmatizing effects of disclosure.  These facts plausibly demonstrate that Golt "acted with complete neglect for the safety and well-being of" Whittaker. *Amisi v. Riverside Reg'l Jail Auth.*, 469 F. Supp. 3d 545, 575 (E.D. Va. 2020) (finding the plaintiff had stated a claim for gross negligence by alleging that the defendant could have easily prevented injury by verifying the plaintiff's identity).  Golt's alleged action raises the inference that Golt breached his duty of care and meets the heightened degree of negligence required for gross negligence. *See id.* at 575 ("[A]lthough [the p]laintiff's allegations do not draw as strong of an inference in support of her gross negligence claim, at this stage, reasonable minds can differ as to the degree of [the defendant]'s negligence, which proves sufficient to survive [the defendant]'s [m]otion to [d]ismiss.").

With respect to proximate cause, Whittaker alleges that another inmate attacked him due to his medical condition.  (*Id.* ¶¶ 51–52.)  The other inmate punched Whittaker in the face because Whittaker "did his hair," through which the other inmate thought he could contract Whittaker's disease.  (*Id.*)  The facts as alleged do not indicate any other means aside from Golt's disclosure by which the other inmate could have learned of Whittaker's medical condition, which

13

raises the inference that the disclosure proximately caused the attack. Because Whittaker factually supports every element of his gross negligence claim against Golt, the Court will deny Golt's motion to dismiss Count Two.

### 4. *O'Sullivan*

Although Golt works for O'Sullivan, O'Sullivan is not liable for the conduct of his deputy. Under Virginia law, a sheriff is liable for the torts of a deputy acting *colore officii* or under color of office. *Bell v. City of Roanoke Sheriff's Office*, No. 7:09cv214, 2009 WL 5083459, at *5 (W.D. Va. 2009) (explaining that the nineteenth century standard for sheriff's liability for deputies remains good law in Virginia). Here, Whittaker alleges no facts to suggest that Golt made the disclosure because he thought he had the authority to do so. Rather, Golt intended merely to demean Whittaker. Whittaker thus fails to state a gross negligence claim against O'Sullivan. *See Westmoreland v. Brown*, 883 F. Supp. 67, 80 (E.D. Va. 1995) (holding that a sheriff was not liable for a deputy's actions in organizing an attack on another inmate because the deputy did not organize the attack under the pretense that he had the authority to do so).

### 5. *Medical Defendants*

Because Whittaker's gross negligence claim arises from the same facts as his negligence claim, Virginia law similarly required him to comply with the expert witness opinion requirement of Virginia Code § 8.01-20.1. *See supra* Part II.A.2; *Fairfax Hosp.*, 239 Va. at 309–11, 389 S.E.2d at 459–60 (explaining that courts must broadly interpret Virginia's statute defining malpractice as "any tort based on health care" (quoting Va. Code Ann. § 8.01-581.1)); *see, e.g.*, *Williams v. Kincaid*, No. 1:20cv1397, 2021 WL 3671186, at *3 (E.D. Va. Aug. 18, 2021) (treating gross negligence claim as a medical malpractice claim). Whittaker failed to certify that he

had a medical expert witness opinion at the time of service of process, so Whittaker fails to state a claim of gross negligence against the medical defendants.

### 6. *CCS*

Because Whittaker fails to state a gross negligence claim against the medical defendants, Whittaker also fails to state a gross negligence claim against CCS through *respondeat superior*. *See Plummer*, 252 Va. at 235, 476 S.E.2d at 173.  Thus, the Court will also dismiss Count Two against CCS.

### C. *Willful and Wanton Negligence (Count Three)*

Whittaker raises a willful and wanton negligence claim against all the defendants because they each acted in conscious disregard of his rights in failing to address his medical concerns.

In Virginia, courts define willful and wanton negligence as "acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another." *Griffin v. Shively*, 227 Va. 317, 321, 315 S.E.2d 210, 213 (1984).  Willful and wanton negligence imposes a more stringent state of mind requirement than gross negligence. *Doe v. Isaacs*, 265 Va. 531, 538, 579 S.E.2d 174, 178 (2003).

### 1. *Earles, Gill, Morgan & Fanelli*

Because willful and wanton negligence imposes a higher standard than gross negligence and Whittaker failed to state a claim of gross negligence against Earles, Gill, Morgan, and Fanelli, he also fails to state a claim of willful and wanton negligence against those defendants. *See id.*  Thus, the Court will dismiss Count Three against Earles, Gill, Morgan, and Fanelli.

### 2. *Golt*

To show willful and wanton negligence, the tortfeasor must know the extent of their risky behavior. *Boward v. Leftwich*, 197 Va. 227, 230–31, 89 S.E.2d 32, 35 (1955). Golt's comment to Whittaker—"[E]veryone should know about you," (ECF No. 16 ¶ 40)—suggests that he knew the sort of treatment Whittaker would endure upon disclosure of his medical condition. Thus, the Court will deny Golt's motion to dismiss Count Three. *See Canada v. Marsi*, No. 3:21-cv-655, 2021 WL 6196998, at *2–3 (E.D. Va. 2021) (cautioning against dismissing a heightened claim of negligence even if, at the pleading stage, it seems likely that only a lesser claim will prevail).

### 3. *O'Sullivan*

For the reasons explained in Part II.B.4, *supra*, O'Sullivan cannot be liable for Golt's alleged willful and wanton negligence. *See Westmoreland*, 883 F. Supp. at 80 (holding sheriff was not liable for conduct of deputy who was not acting "under color of office"). Thus, the Court will dismiss Count Three against O'Sullivan.

### 4. *Medical Defendants*

Because Whittaker's willful and wanton negligence claim arises from the same facts as his negligence claim, Virginia law required him to comply with the expert witness opinion requirement of Virginia Code § 8.01-20.1. *See supra* Part II.A.2; *Fairfax Hosp.*, 239 Va. at 309–11, 389 S.E.2d at 459–60 (explaining that courts must broadly interpret Virginia's statute defining malpractice as "any tort based on health care" (quoting Va. Code Ann. § 8.01-581.1)); *see, e.g.*, *Marro v. BriovaRx Infusion Servs., Inc.*, No. 1:18cv1266, 2019 WL 10960566, at *1–2 (E.D. Va. Mar. 7, 2019) (treating willful and wanton negligence claim as medical malpractice claim). Whittaker failed to certify that he had a medical expert witness opinion at the time of

16

service of process, so Whittaker fails to state a claim of willful and wanton negligence against the medical defendants. Thus, the Court will dismiss Count Three against the medical defendants.

Because Whittaker fails to state a claim of willful and wanton negligence claim against the medical defendants, Whittaker also fails to state a willful and wanton negligence claim against CCS through *respondeat superior*. *See Plummer*, 252 Va. at 235, 476 S.E.2d at 173. Thus, the Court will dismiss Count Three against CCS.

### D. Failure to Provide Adequate Medical Care (Count Four)

Whittaker raises a failure to provide adequate medical care claim under § 1983 against Golt, Fanelli, Morgan, Earles, Gill, and the medical defendants. (ECF No. 16 ¶ 127.) He alleges that these defendants acted with deliberate indifference to his medical needs to the point of violating his Fourteenth Amendment rights. (*Id.* ¶ 125.)

The Eighth Amendment guarantees inmates' access to medical care while incarcerated. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).[10] "[D]eliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). For a deliberate indifference claim, prison officials must know of an excessive risk to an inmate's health or safety and disregard that risk. *Farmer*, 511 U.S. at 835. The harm or risk of harm must be "objectively, sufficiently serious," *id.* at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)), and the officials must have a "sufficiently culpable state of mind," *id.* (quoting *Wilson*, 501 U.S. at 297). "*Farmer* expressly equated the 'deliberate indifference' standard ap-

---

[10] Although Whittaker grounds his § 1983 claims in the Fourteenth Amendment, "[courts in the Fourth Circuit] traditionally apply Eighth Amendment deliberate indifference precedents to such claims" arising out of the treatment of pretrial detainees. *Moss v. Harwood*, 19 F.4th 614, 624 (4th Cir. 2021).

plied in Eighth Amendment cases with the 'subjective recklessness' standard of criminal law." *Brown v. Harris*, 240 F.3d 383, 389 (4th Cir. 2001) (citing *Farmer*, 511 U.S. at 839–40). An official who responds reasonably to a known excessive risk is not deliberately indifferent, even if the response failed to prevent the threatened harm. *Id.* at 389 (quoting *Farmer*, 511 U.S. at 844).

Whittaker's particular medical condition presents a sufficiently serious risk of harm. *See, e.g.*, *Taylor v. Barnett*, 105 F. Supp. 2d 483, 487 (E.D. Va. 2000). Thus, the Court must address whether the defendants possessed the requisite state of mind.

### 1. *Golt, Fanelli, Morgan, & Earles*

Whittaker fails to allege that Golt, Fanelli, Morgan, or Earles possessed the knowledge required for deliberate indifference.[11] In *Moss v. Harwood*, the Fourth Circuit held that the inmate had not satisfied the subjective prong of the deliberate indifference test merely through repeated requests for his medication to non-medical personnel. 19 F.4th at 625 ("[A] request for medication does not by itself indicate an emergency, and none of [the plaintiff's] communications conveyed to the defendants that immediate intervention was required to avoid a substantial risk of harm."). Nor was general knowledge concerning the severity of the plaintiff's condition—thyroid disease—enough to suggest that the jail officials knew the risks associated with delayed medication. *Id.* Likewise, Whittaker cannot show that Golt, Fanelli, Morgan, or Earles

---

[11] The jail defendants also argue that, because Whittaker had no constitutional right to a grievance procedure, *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017), he cannot bring a constitutional claim based on inadequacies in such a procedure, (ECF No. 41, at 4). Whittaker's claims, however, expand beyond mere inadequacies in the grievance procedure. He refers to his many grievances only to establish the requisite state of mind for deliberate indifference. For the Court to dismiss on these grounds would suggest that alleging inadequacies in a grievance procedure waives related constitutional claims. Thus, the Court will decide on motion to dismiss the deliberate indifference claim on other grounds.

knew of the risk to his health through mere requests for medication or even knowledge of his medical condition.

First, the complaint does not suggest that Golt understood the severity of Whittaker's condition. Whittaker only asked Golt to retrieve medical staff so that he could take his medication, (ECF No. 16 ¶ 33), but "a request for medication does not by itself indicate an emergency." *Moss*, 19 F.4th at 625. Additionally, as discussed above, non-medical personnel's knowledge of a medical condition does not alone satisfy the subjective prong of a deliberate indifference claim. Thus, Whittaker fails to state a claim of deliberate indifference against Golt.

Though unclear, Fanelli may have received a written form restating the concerns in Whittaker's first grievance. (ECF No. 16 ¶¶ 50, 66.) Whittaker does not, however, explain the extent to which he communicated the risk that came with delayed medication. Similarly, Whittaker does not allege that he communicated the severity of his condition in his conversation with Morgan about his privacy concerns. (*Id.* ¶ 68.) Earles also received Whittaker's second grievance, but the contents of that form are unclear. (*Id.* ¶¶ 69–70.)

Though Fanelli, Morgan, and Earles might have known that Whittaker had missed doses of a daily prescription for a serious condition, Whittaker still fails to state a claim because the defendants lacked any expertise to assess any risk associated with missed doses of his medication. Given the discreet nature of Whittaker's condition, he fails to allege facts that would suggest the jail defendants understood the severity of his condition. *See Moss*, 19 F.4th at 625. The Court will thus grant the motion to dismiss Count Four against Golt, Fanelli, Morgan, and Earles.

### 2. *Gill*

Unlike for the other jail defendants, Whittaker clearly communicated the severity of his condition to Gill in their meeting because he explained he faced a greater risk of contracting

19

COVID-19. (ECF No. 16 ¶ 46.) Gill, however, responded reasonably by speaking to medical personnel about the delays. *See Farmer*, 511 U.S. at 844; *see, e.g.*, *Moss*, 19 F.4th at 625 (explaining that even if the defendants knew of a risk to the inmate's health, they were not indifferent because they informed medical staff of the inmate's requests). Thus, Whittaker fails to state a claim for deliberate indifference against Gill, and the Court will dismiss Count Four against him.

### 3. *Smith & Taylor*

For deliberate indifference claims against medical personnel, "an assertion of mere negligence or malpractice is not enough to constitute [a constitutional] violation." *Taylor*, 105 F. Supp. 2d at 487 (citing *Estelle*, 429 U.S. at 106; *Daniels v. Williams*, 474 U.S. 327, 328 (1986); *Miltier v. Beorn*, 896 F.2d 848, 851–52 (4th Cir.1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837). Medical personnel, however, do not benefit from the apparent leniency afforded non-medical personnel for non-obvious health risks. *See Moss*, 19 F.4th at 625. To satisfy the deliberate indifference test, "the treatment given must be 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Hixson v. Moran*, 1 F.4th 297, 303 (4th Cir. 2021) (quoting *Miltier*, 896 F.2d at 851). For a deliberate indifference claim arising from a delay in care, a plaintiff must allege facts that suggest the delay resulted in "substantial harm." *Oden v. Wilson*, No. 3:17cv489, 2019 WL 6357247, at *10 (E.D. Va. Nov. 27, 2019). A plaintiff may satisfy the substantial harm requirement through "lifelong handicap, permanent loss, or considerable pain." *Id.* (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)). Deliberate indifference cases arising from treatment for Whittaker's particular medical condition require "a careful evaluation of all the facts and circumstances surrounding the allegations." *Taylor*, 105 F. Supp. 2d at 488. "[T]he mere fact that [a]

correctional facility fails to provide an inmate with prescribed medication on a timely basis is not sufficient to state a claim of deliberate indifference." *Id.* at 487.

Whittaker's allegations concerning Taylor and Smith do not indicate a state of mind beyond mere negligence. While a plaintiff may use circumstantial evidence to satisfy the subjective prong of deliberate indifference, *Coppage v. Mann*, 906 F. Supp. 1025, 1039 (E.D. Va. 1995) (quoting *Farmer*, 511 U.S. at 842), Whittaker does not allege facts that suggest Taylor knew of the delay in medication. He does not allege that he ever contacted or spoke with Taylor to put him on actual notice. (ECF No. 16 ¶ 13.) Likewise, Whittaker does not allege that Smith knew of the delays in his medication. He alludes to her presence in his meeting with Morgan, but he does not explain what they discussed at that meeting beyond privacy concerns. (ECF No. 16 ¶ 68 ("On July 30, 2021, . . . Morgan advised [Whittaker] that there is not a deputy that deals with HIPPA violations").) Thus, the Court will dismiss Count Four against Taylor and Smith.

### 4. *Winstead*

Winstead was the first person that Whittaker spoke to concerning his missed doses of medication and lack of bloodwork during his time at the Chesapeake Correctional Center. (ECF No. 16 ¶¶ 25–29.). Thus, Winstead had actual knowledge of Whittaker's grievances. Further, because Whittaker alleges that he explained to Winstead his increased susceptibility to illness, (*id.* ¶ 26), she may have known of the substantial risk to his health. Her alleged response of "that is not my problem," (*id.* ¶ 27), suggests a state of mind more culpable than "mere negligence or malpractice." *See Taylor*, 105 F. Supp. 2d at 487. Additionally, Whittaker alleges that he contracted COVID-19 due to increased vulnerability after missing several doses of his medication and that he suffered several symptoms. (ECF No. 16 ¶ 76.) This raises the inference that his delay in care resulted in "substantial harm." *See Oden*, 2019 WL 6357247, at *10. It remains un-

clear whether Winstead's conduct was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier*, 896 F.2d at 851. But to adequately assess Winstead's conduct requires reference to an appropriate standard of care, *see Badu v. Broadwell*, No. 5:11-CT-3192-F, 2013 WL 286262, at *5 (E.D.N.C. Jan. 24, 2013) (denying doctor's motion to dismiss because his "defense that his treatment nevertheless exceeded the constitutional minimum is better argued upon a more fully developed record in summary judgment proceedings"). Thus, it would be premature for the Court to dismiss Whittaker's claim without more information. Accordingly, the Court will deny Winstead's motion to dismiss Count Four.

### 5. *Jones*

Though Jones never spoke with Whittaker, Whittaker can satisfy the subjective prong of the deliberate indifference test with circumstantial evidence. *See Coppage*, 906 F. Supp. at 1039 (quoting *Farmer*, 511 U.S. at 842).[13] The fact that Whittaker requested that Winstead inform Jones specifically of the lack of bloodwork suggests that Jones knew about Whittaker's medical needs. (*See* ECF No. 16 ¶ 28.) Furthermore, Gill informed Jones of Whittaker's grievances regarding his missed medication, and Gill said Jones would come to speak with Whittaker. (*Id.* ¶¶ 45–47.) The fact that Jones never spoke with Whittaker, (*id.* ¶ 48), raises the inference that Jones ignored Whittaker's grievances. Without knowing the reason for the delays, the Court should not dismiss Whittaker's claim against Jones at the pleading stage:

---

[13] The fact that Whittaker "*received 320 doses* of [his] medication while . . . incarcerated," (ECF No. 72 ¶ 18 (emphasis in original)), does not absolve Jones of constitutional liability, *see De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) ("[J]ust because [the defendants] have provided [the plaintiff] with some treatment consistent with the . . . Standards of Care, it does not follow that they have necessarily provided her with constitutionally adequate treatment.").

> The common thread throughout [cases concerning inadequate treatment in prison
> for Whittaker's particular medical condition] is a careful evaluation of all the facts
> and circumstances surrounding the allegations of denial of proper medical care to
> determine whether the defendant acted with deliberate indifference or acted upon
> informed medical judgment, even if that judgment was in error.

*Taylor*, 105 F. Supp. 2d at 488.  Because Jones's choice to ignore him may have caused the delay

in medication, Whittaker has adequately stated a constitutional claim of deliberate indifference

again Jones.  Thus, the Court will deny Jones's motion to dismiss Count Four.

### E. Right to Privacy (Count Five)

Whittaker raises a privacy right claim under § 1983 against defendants Golt and Win-

stead. (ECF No. 16 ¶ 139.)  He alleges that they disclosed private medical information in viola-

tion of his Fourteenth Amendment rights.  (*Id.* ¶ 136–37.)

In determining the scope of constitutional privacy rights, the Fourth Circuit applies a two-

part test that first asks whether "a reasonable expectation of privacy" exists, and second, whether

"a compelling governmental interest in disclosure outweighs the individual's privacy interest."

*Walls v. City of Petersburg*, 895 F.2d 188, 192 (4th Cir. 1990).  The Supreme Court has ex-

plained that prisoners do not have a legitimate expectation of privacy in their cells under the

Fourth Amendment.  *Hudson v. Palmer*, 468 U.S. 517, 525–26 (1984).  And, in interpreting

*Hudson* and applying part one of the *Walls* test to an inmate's Fourteenth Amendment privacy

claim, the Fourth Circuit held that an inmate does not have a reasonable expectation of privacy

with respect to Whittaker's particular medical condition.  *Payne v. Taslimi*, 998 F.3d 648, 658

(4th Cir. 2021).

In *Payne*, a doctor accidentally disclosed the diagnosis for an inmate who had the same

condition as Whittaker within a prison medical center.  *Id.* at 653.  The Fourth Circuit held that

the inmate failed the first prong of the *Walls* test because he "lacked a reasonable expectation of

privacy in his . . . medication and diagnosis." *Id.* at 657. *Payne* makes it clear: "Where an inmate lacks a reasonable expectation of privacy, he lacks it for all purposes." *Id.* at 658–59. Because the reason for disclosure does not affect whether a reasonable expectation of privacy exists,[14] Whittaker lacks any constitutional privacy rights concerning his medical condition. Accordingly, the Court will dismiss Count Five.

### F. Unauthorized Disclosure (Count Six)

Whittaker raises an unauthorized disclosure claim against defendants Golt, Winstead, O'Sullivan, and CCS under state law because Winstead and Golt improperly disclosed his medical information. (ECF No. 16 ¶ 143–48.)

#### 1. Golt & O'Sullivan

Whittaker sues Golt and O'Sullivan for unauthorized disclosure under § 53.1-133.03 of the Virginia Code. (ECF No. 58, at 10.) He argues that the statute creates a private right of action because it limits the disclosure of confidential medical information of inmates to specific individuals in particular circumstances.[15]

The statute does not, however, explicitly create a private cause of action. And the Court will not imply one unless the Virginia legislature's intent to create such a right is "'palpable' and shown by 'demonstrable evidence.'" *Michael Fernandez, D.D.S., Ltd. v. Comm'r of Highways,*

---

[14] The Fourth Circuit has never considered whether there exists a reasonable expectation of privacy with respect to gratuitous disclosure, or disclosure for the purpose of "humor or gossip." *See Powell v. Schriver,* 175 F.3d 107, 109, 112 (2d Cir. 1999). As the Fourth Circuit explained, however, "[w]hatever the merits of that position, [courts in the Fourth Circuit] are constrained to apply [the] holding in *Walls* to the contrary." *Payne,* 998 F.3d at 660 n.10.

[15] Section 53.1-133.03(A) allows certain individuals, such as the person in charge of a correctional facility, to obtain medical and mental health information about an inmate without the inmate's consent in certain situations.

298 Va. 616, 618, 842 S.E.2d 200, 202 (2020) (quoting *Cherrie v. Va. Health Servs., Inc.*, 292 Va. 309, 315, 787 S.E.2d 855, 858 (2016)). Nor will the Court imply such a right when a method of judicial enforcement already exists. *Id.* at 618, 842 S.E.2d at 203.

No legislative history suggests the Virginia legislature intended to create a private right of action with § 53.1-133.03. Further, there already exists a judicial procedure for the improper disclosure of an inmate's medical information. Section 53.1-125 provides that if a sheriff fails to comply with regulations from the State Board of Local and Regional Jails, the Board shall file a complaint with the local circuit court. Because the Board creates regulations concerning the exchange of inmates' medical information under § 53.1-133.03, Va. Code Ann. § 53.1-68,[16] the process outlined in § 53.1-125 is the proper avenue of adjudication for disclosures that do not comply with the Board's regulations. § 53.1-133.03(C) ("The release of medical and mental health information and records to any other agency or individual shall be subject to all regulations promulgated by the State Board of Local and Regional Jails that govern confidentiality of such records.").

Without any indication that the Virginia General Assembly intended to create a right of action under § 53.1-133.03, and the availability of a different method of judicial enforcement for

---

[16] "The Board shall establish minimum standards for behavioral health services in local correctional facilities and procedures for enforcing such minimum standards . . . including requirements for . . . (iii) the provision of behavioral health services in local correctional facilities, as well as regulations directing the sharing of medical and mental health information and records in accordance with § 53.1-133.03." Va. Code Ann. § 53.1-68.

the improper disclosure of medical information within jails, the Court will not imply a private right of action.[17]  The Court will dismiss Count Six against Golt and O'Sullivan.

### 2. *Winstead & CCS*

Virginia courts permit a right of action against medical professionals for unauthorized disclosure of medical information. *Fairfax Hosp. v. Curtis*, 254 Va. 437, 442, 492 S.E.2d 642, 645 (1997).[18]  Whittaker does not, however, allege any facts to support his allegation that Winstead "communicated [Whittaker's medical condition to] . . . non-medical staff." (ECF No. 16 ¶ 143.)  Whittaker alleges only that Winstead knew of his condition, that Golt later also knew of his condition, and that these individuals had this information in a facility where Virginia law permits the disclosure of an inmate's medical information to certain personnel. *See supra* note

---

[17] *Cf. Shumate v. City of Martinsville*, No. 151285, 2016 WL 5327477, at *2 (Va. 2016) (finding that no right of action exists for unauthorized disclosure by non-medical personnel under Va. Code § 32.1-127.1:03(A)(3)).

[18] Winstead argues that the right of action for unauthorized disclosure does not extend to inmates because privacy rights are limited in prisons. *See Hudson*, 468 U.S. at 525–526; *Payne*, 998 F.3d at 658.   Neither *Hudson* nor *Payne* control here, however, because those cases were rooted in constitutional protections rather than state law. *See Hudson*, 468 U.S. at 525–26 (assessing whether Fourth Amendment protection from unreasonable searches applied within prisons); *Payne*, 998 F.3d at 653 (assessing whether Fourteenth Amendment privacy rights applied to the accidental disclosure of inmate's medical condition).  As the Supreme Court of Virginia explains:

> In [Virginia's] jurisprudence, a health care provider owes a duty of reasonable care to the patient. Included within that duty is the health care provider's obligation to preserve the confidentiality of information about the patient which was communicated to the health care provider or discovered by the health care provider during the course of treatment.  Indeed, confidentiality is an integral aspect of the relationship between a health care provider and a patient and, often, to give the health care provider the necessary information to provide proper treatment, the patient must reveal the most intimate aspects of his or her life to the health care provider during the course of treatment.

*Fairfax Hosp.*, 254 Va. at 442, 492 S.E.2d at 644.

16. This falls short of the "facial plausibility" required at the pleading stage. *See Iqbal*, 566 U.S. at 678. Thus, the Court will dismiss Count Six against Winstead.

Because Whittaker fails to state an unauthorized disclosure claim against Winstead, Whittaker also fails to state an unauthorized disclosure claim against CCS through *respondeat superior. See Plummer*, 252 Va. at 235, 476 S.E.2d at 173. Accordingly, the Court will dismiss Count Six against CCS.

### G. Failure to Supervise (Count Seven)

Whittaker raises supervisory liability claims against defendants O'Sullivan, Smith, Jones and Taylor under § 1983. (ECF No. 16 ¶ 157.) He alleges that these defendants failed to supervise the individuals responsible for providing him with medical care and maintaining confidentiality of his health information in violation of his constitutional rights. (*Id.* ¶¶ 153–54.)

A claim of supervisory liability under § 1983 requires:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

#### 1. O'Sullivan

Whittaker says that O'Sullivan failed to supervise subordinates who "were failing to protect, provide necessary medical care and keep confidential inmates' private health information." (ECF No. 16 ¶ 153.) As discussed in Part II.E, *supra*, Whittaker lacks a constitutional right to privacy. *See Payne*, 998 F.3d at 658. Additionally, Whittaker concedes that he has not stated a claim for supervisory liability for failure to provide adequate medical care against the jail de-

fendants. (ECF No. 58, at 11 n.1.) Thus, his supervisory liability claim against O'Sullivan cannot stand, and the Court will dismiss Count Seven against him.

### 2. *Smith, Jones, & Taylor*

Whittaker never alleges that Smith supervised anyone. Thus, a claim of supervisory liability against Smith cannot stand, and the Court will dismiss Count Seven against Smith.

While Whittaker does allege facts that suggest Jones ignored his medical needs, *see supra* Part II.D.5, and that she served as a supervisor in some capacity, he does not allege facts that suggest a constitutional injury arose from the supervisory relationship between Jones and Winstead. Thus, Whittaker fails to state a claim for supervisory liability against Jones, and the Court will dismiss Count Seven against her.

Finally, the complaint contains almost no factual allegations concerning Taylor. Though Whittaker does state his title as Medical Director, this does not state a claim for supervisory liability. *See Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Because Whittaker alleges nothing more than Taylor's supervisory position, he fails to state a claim for supervisory liability against Taylor. The Court will dismiss Count Seven against Taylor.

### H. Failure to Supervise (Count Eight)

Whittaker raises supervisory liability claims against defendants O'Sullivan, Earles, Gill, Morgan, and Fanelli under § 1983. (ECF No. 16 ¶ 163.) He alleges that these defendants failed to supervise the individuals responsible for maintaining the confidentiality of his health information in violation of his constitutional rights. (*Id.* ¶¶ 159–60.)

Because Whittaker lacks a constitutional right to privacy with respect to his health condition, *see Payne*, 998 F.3d at 658, Whittaker fails to state a claim for supervisory liability against these defendants. *See Temkin v. Frederick Cnty. Com'rs*, 945 F.2d 716, 724 (4th Cir. 1991) ("A claim . . . under section 1983 cannot be made out against a supervisory authority absent a finding of a constitutional violation on the part of the person being supervised."). Accordingly, the Court will dismiss Count Eight.

### *I. Official Custom, Policy, Pattern, or Practice (Count Nine)*

Whittaker raises a municipal liability claim against O'Sullivan and Taylor in their official capacities and CCS under § 1983. (ECF No. 16 ¶ 172.) He alleges that these defendants permitted a widespread practice of deliberate indifference to inmates' medical needs in violation of his constitutional rights. (*Id.* ¶¶ 165–67.) A claim for municipal liability under § 1983 requires a plaintiff to allege that his constitutional rights have been violated through an official policy or custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978).[19] A policy may exist in one of four ways:

---

[19] Plaintiffs may raise municipal liability claims against a government official in the individual's official capacity. *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (citing *Monell*, 436 U.S. at 690 n.55). Because Whittaker's official capacity claims "represent only another way of pleading an action against" the municipality, *id.* at 165, the Court addresses his claims against CCS, O'Sullivan, and Taylor together, *Spell v. McDaniel*, 824 F.2d 1380, 1396 (4th Cir. 1987) (explaining that a plaintiff need not name multiple parties in their official capacities "to prosecute a claim of municipal liability . . . against a municipality"); *see Singleton v. Emran*, No. 3:15cv200, 2017 WL 388821, at *7 (E.D. Va. Jan. 27, 2017) (explaining that "a private corporation [like CCS] is liable under § 1983 only when an official policy or custom of [CCS] causes the alleged deprivation of federal rights"); *see also Riddick v. Watson*, 503 F. Supp. 3d 399, 415 (E.D. Va. 2020) (finding CCS may be sued under § 1983 because provision of medical care to inmates is "traditionally the exclusive prerogative of the state" (quoting *Conner v. Donnelly*, 42 F.3d 220, 223–24 (4th Cir. 1994))).

To the extent Whittaker seeks to hold CCS liable for constitutional violations under a theory of *respondeat superior*, though, his claim would fail. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727–28 (4th Cir. 1999).

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (cleaned up) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)). Persistent and widespread practices of employees may only be attributed to a municipality if "the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body." *Spell*, 824 F.2d at 1387. "[M]unicipal liability will attach only for those policies or customs having a '*specific* deficiency or deficiencies . . . such as to make the *specific* violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run.'" *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (emphasis and omission in original) (quoting *Spell*, 824 F.2d at 1390).

First, Whittaker does not cite any express policy that caused any violation of his constitutional rights. Second, Whittaker does not allege any decisions O'Sullivan made as the final decision maker. Third, although Whittaker asserts that Chesapeake Correctional Center failed to provide adequate medical care and did not maintain confidential health records, (ECF No. 16 ¶¶ 165–66), his factual allegations do not suggest a specific omission. *See City of Canton v. Harris*, 489 U.S. 378, 389 (1989) ("Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983."). The Court thus assesses his claim under the persistent and widespread practice theory.

As an initial matter, Whittaker has adequately pleaded constitutional injuries at the hands of jail medical personnel. *See supra* Parts II.D.4–5. He must further allege that those injuries arose from a persistent and widespread practice. *See Lytle*, 326 F.3d at 471. While Whittaker

does not allege instances of constitutional harm beyond his own experience, "'[t]here is no requirement that [a plaintiff] . . . plead the multiple incidents of constitutional violations that may be necessary at later stages to establish the existence of an official policy or custom and causation' to survive a Rule 12(b)(6) motion to dismiss." *Stout v. Harris*, No. 3:21cv468, 2022 WL 363873, at *7 n.16 (E.D. Va. Feb. 7, 2022) (alterations in original) (quoting *Jordan by Jordan v. Jackson*, 15 F.3d 333, 339 (4th Cir. 1994)). Given the persistence of the actions underlying Whittaker's grievances despite several communications with jail officials, the problems that he alleges may run much deeper than his particular harm. Discovery could very well reveal evidence of widespread issues concerning medical care at the Chesapeake Correctional Center. Thus, the absence of factual allegations concerning the scope of unconstitutional practices is not fatal to Whittaker's claim. *See Twombly*, 550 U.S. at 544 ("Asking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]."). Because Whittaker has stated a claim of municipal liability, the Court will deny the motions to dismiss Count Nine.

### III. CONCLUSION

The Court will grant Earles, Gill, Fanelli, and Morgan's motion to dismiss because Whittaker fails to state a claim with respect to those defendants. Likewise, the Court will grant Smith's motion to dismiss because Whittaker fails to state a claim against her.

The Court will grant Golt's motion to dismiss Counts One, Four, Five, and Six. The Court will deny Golt's motion to dismiss Counts Two and Three because Whittaker has adequately stated a claim for gross negligence and willful and wanton negligence against Golt.

The Court will grant Winstead's motion to dismiss Counts One, Two, Three, Five, and Six. The Court will deny her motion to dismiss Count Four because Whittaker has stated a claim for failure to provide adequate medical care against Winstead.

The Court will grant Jones's motion to dismiss Counts One, Two, Three, and Seven. The Court will deny her motion to dismiss Count Four because Whittaker has stated a claim for failure to provide adequate medical care against Jones.

The Court will grant Taylor's motion to dismiss Counts One, Two, Three, Four, and Seven. The Court will deny his motion to dismiss Count Nine because Whittaker has stated a claim for municipal liability against Taylor in his official capacity.

The Court will grant O'Sullivan's motion to dismiss Counts One, Two, Three, Six, Seven, and Eight. The Court will deny his motion to dismiss Count Nine because Whittaker has stated a claim for municipal liability against O'Sullivan in his official capacity.

The Court will grant CCS's motion to dismiss Counts One, Two, Three, and Six. The Court will deny its motion to dismiss Count Nine because Whittaker has stated a claim for municipal liability against CCS.

Finally, the Court observes that, at the motion to dismiss stage, the plaintiff enjoys considerable latitude in "alleging" claims. At the summary judgment stage, however, he must put up evidence supporting his claims, an entirely different ballgame.

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date:____9____August 2022
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge